No. 24,256.

C. A. LEINBACH, *Appellee*, v. J. B. DYATT et al., *Appellants.*

SYLLABUS BY THE COURT.

1. SPECIFIC PERFORMANCE—*Sale of Land—Compromise on Agent's Commission* —*Right to Specific Performance.* The evidence is held to have a tendency to show that after a contract relating to negotiations for the sale of lands had been entered into between the owner and an agent it was so far performed that a controversy as to the commission earned arose which was sufficient to sustain a compromise providing for the payment of a certain amount; that such compromise was made; that the landowner then executed a contract for the sale of a tract to the agent, a part of the commission owing him to constitute the cash payment; and that the agent was entitled to the specific performance of the contract.

2. SAME—*Evidence.* Objections to the admission of evidence are held to be not well taken.

3. SAME—*Written Contract—Subsequent Sale and Conveyance of Same Land to Third Party—Notice of Existence of Prior Contract.* The evidence is held sufficient to sustain findings that one who took a conveyance of land, after the owner had executed a written contract for its sale to another, did so with notice of the existence of the contract, and with a purpose to defeat the rights of the earlier buyer.

4. SAME. The buyer's right to the specific performance of a written contract for the sale of land cannot be defeated by the seller conveying to one who has knowledge of the prior agreement.

5. SAME—*Alternative Relief Asked and Adjudged—No Misjoinder of Causes of Action.* An action by the buyer for specific performance of a contract for the sale of land, where alternative relief of damages with a lien on the land is asked and adjudged, is one to enforce a lien, within the meaning of the statute providing that in such cases the causes of action joined need not affect all the parties.

6. SAME—*Decree Refused—Existence of Mortgage—Subsequent Purchaser with Notice—Judgment.* Where in an action by the buyer a decree of specific performance of a land contract is prevented by the existence of a mortgage, the release of which the seller defendant has not procured, personal judgment being rendered against him for the return of the part of the purchase price paid, findings by the trial court that a third person to whom the seller executed a deed took it with knowledge of the prior contract, for the purpose of depriving the buyer of his rights, do not require the extension of the personal judgment so that it will run against such third person also.

Appeal from Sherman district court; CHARLES I. SPARKS, judge. Opinion filed February 10, 1923. Affirmed.

*E. F. Murphy, E. E. Euwer,* both of Goodland, *L. H. Wilder,* of Norton, *John B. Pew,* and *John L. Gaylord,* both of Kansas City, Mo., for the appellants.

*A. M. Harvey, J. E. Addington,* and *Frank Doster,* all of Topeka, for the appellee.

The opinion of the court was delivered by

MASON, J.: C. A. Leinbach brought this action seeking the specific performance of a written contract by which he claims that J. B. Dyatt agreed to sell to him a tract of several sections, and asking damages as alternative relief in case specific performance could not be had. The trial court decided in favor of the plaintiff, and finding that a conveyance of a clear title could not be made, gave him a personal judgment against Dyatt for the amount of the purchase price he had paid, secured by a lien upon the land, which had been deeded to Andrew Dyatt, his brother. The two Dyatts and their wives, who were also made defendants, appeal from this judgment, and the plaintiff, by way of cross-appeal, asks that he have personal judgment also against Andrew Dyatt. The North American Life Insurance Company has a mortgage on the land (perhaps including other tracts), executed by Andrew Dyatt and his wife. That company was also made a defendant, but the judgment did not attempt to disturb its lien, and it does not appeal. As it is not an interested party the term defendants will be used to designate the Dyatts.

In April, 1919, a written contract was entered into which may be spoken of as one between J. B. Dyatt and the plaintiff, for the latter acquired the interest of a partner who was originally associated with him in the deal. It provided that the plaintiff was to advertise and conduct an auction sale of 16,000 acres of land owned by Dyatt, for a commission of 10 per cent of the sale price, sales to average $20 an acre, terms to be 25 per cent cash, deferred payments to bear 6 per cent interest. The advertising was done and arrangements made for the sale, which was begun in the presence of prospective bidders and many others on the afternoon of May 6, and continued during the afternoon of the next day, Andrew Dyatt acting as clerk. A number of bids were made and accepted on each day, some of them by Andrew Dyatt and Dyatt relatives. On the second day the tract here in controversy was put up and bid on, being run up to $34.50 an acre. The plaintiff then made a bid of $35 an acre, which was accepted.

From this point the testimony is in conflict. According to the

plaintiff's version of the affair this is what happened: His bid was made in behalf of, and at the request of, Andrew Dyatt, who afterwards repudiated it. The plaintiff then agreed to stand by it and take the property. There was a disagreement between him and J. B. Dyatt as to what sales had been made and what amount of commission had been earned. They finally agreed to a settlement on this basis: the plaintiff was to have a commission of $27,200, which was arrived at by including a commission on the sale of the tract to himself; he was to be paid $2,000 in money; the remaining $25,200 was to be credited as his cash payment upon the land in controversy, the deferred amount, $75,600, to be payable in ten years, secured by note and mortgage. A written contract for the sale of the land on these terms was executed by J. B. Dyatt and the plaintiff. Another written agreement was made between them at the same time giving J. B. Dyatt an option to receive the land back by paying the plaintiff $27,200 by July 15, 1919.

J. B. Dyatt denied having made such a settlement or having knowingly signed the contracts relating to the sale of the land to the plaintiff. He testified, in effect, that he signed them supposing them to be two of some ten sales contracts that were to be executed in duplicate—papers to close up the sales.

1. The defendants urge that the petition did not state and the evidence did not tend to show a cause of action. We regard the petition as sufficient to advise the defendants of the nature of the plaintiff's claims, and the objections made to it will necessarily be covered in a consideration of the question whether the evidence was sufficient to support the judgment.

There is a conflict in the testimony as to how many and what sales were made, and what commission, if any, the plaintiff had earned. The decision of the trial court must of course be regarded as settling all such disputes in favor of the plaintiff. Moreover, inasmuch as the plaintiff relies upon an adjustment and settlement of these matters the merits of the original disagreement are no longer important if his claim in that regard is sustained. The vital questions in the case are involved in a discussion of the making, validity and effect of the compromise, and the extent to which the original contract was performed will only be hereinafter referred to in connection therewith.

The defendants urge that the claim of the plaintiff to the commission could not serve as a sufficient consideration for the com-

promise, on the ground that it was not made in good faith and was wholly without foundation in law or fact, and specifically because the provisions of the original contract that the land sold should average $20 per acre, and that 25 per cent of the purchase price should be paid in cash, were not complied with. "A doubtful or disputed claim, sufficient to constitute a good consideration for an executory contract of compromise, has been defined as one honestly and in good faith asserted, arising from a state of facts upon which a cause of action can be predicated, with the reasonable belief on the part of the party asserting it that he has a fair chance of sustaining his claim, and concerning which an honest controversy may arise, although in fact the claim may be wholly unfounded." (5 R. C. L. 881; see, also, 12 C. J. 327-333.) From what has already been stated it is evident that it cannot be said as a matter of law that the plaintff could not reasonably have believed in the claim he put forward. The question of good faith was likewise one of fact in which the decision of the trial court is final. There was evidence that before the beginning of the sale there was an agreement, to which J. B. and Andrew Dyatt were parties, that the land might be put up for sale without the $20 per acre restriction. If J. B. Dyatt entered into contracts of sale with the persons with whom the plaintiff had negotiated deals, he could hardly be heard to complain in a controversy over commission that the terms were not such as he had originally fixed. There was specific testimony that J. B. Dyatt accepted two bids about which there had been a controvery, and acknowledged that they were satisfactory to him. In the defendants' brief it is said: "The evidence of the appellee tended to show that all of these sales (referring to sales of 13,280 acres) were satisfactory to and accepted by J. B. Dyatt, and that J. B. Dyatt agreed to allow commissions thereon, said commissions being, by virtue of the auction contract, ten pen cent of the amount for which the property sold." Questions are raised as to the financial ability of some of the buyers, including the plaintiff. Where the seller accepts a buyer produced by his agent, so far as to enter into a contract of sale with him, his lability for the commission is no longer affected by the question of the buyer's ability to pay. (*Button v. Stewart,* 90 Kan. 602, 135 Pac. 681.) The trial court having found, upon sufficient evidence that the written contract for the sale of land to the plaintiff was knowingly entered into by J.

B. Dyatt, a case for specific performance was made out unless it should be denied for some special reason.

The defendants assert that the plaintiff's action is founded on the original contract for the ten per cent commission; that to entitle him to recover it was necessary for him to show a full compliance therewith on his part; and that he has not done so. As already indicated we regard the question of performance as taken out of the case by the compromise. It is also urged that the plaintiff's conduct, according to his own story, in putting in a bid in behalf of Andrew Dyatt, precludes a recovery of commissions, on the ground that he could not act as the agent both of the buyer and the seller. He was not personally acting as the auctioneer, and it is not clear that in merely putting in a bid in his own name for another person he was guilty of any disloyalty to the owner of the land; but whatever right J. B. Dyatt might have had to avail himself of that contention, or to object to the plaintiff himself being a purchaser, has in our judgment likewise been lost by his entering into the adjustment referred to.

The contract sued upon, by which J. B. Dyatt agreed to convey the land to the plaintiff, recited that the plaintiff had deposited the payment of $25,200 in a bank. The defendants urge that the fact that the money had not been so deposited is sufficient to defeat the performance of the contract. The contract giving J. B. Dyatt the option to repurchase or redeem the land contained, as a part of the recital of the execution of the sale agreement, the words, "and in consideration of a settlement of certain auctioneer and sale commissions, the party of the first part (the plaintiff) has paid twenty-seven thousand two hundred dollars." It is clear from this as well as from the oral evidence concerning the settlement that $25,200 of the amount of commissions agreed upon was paid by treating it as the cash payment on the sale of the land to the plaintiff.

2. The defendants complain of the admission of testimony that at the time of the sale J. B. Dyatt consented to a removal of the $20 per acre restriction on the average price at which the land should be sold, on the ground that it was an attempt to vary the terms of a written contract by parol. The alleged consent was given after the execution of the contract, and it would appear that the seller might, if he saw fit, waive a condition of the sale without affecting his liability. But in any event, the evidence was admissible upon the issue of the good faith of the plaintiff's claim to having earned his

commissions. A witness testified that J. B. Dyatt told him he was willing to carry out the contract to convey the land to the plaintiff, but that Andrew Dyatt would not allow him to do so. Objection is made to this testimony on the ground that it was not binding on Andrew Dyatt because the statement was not said to have been made in his presence. The presumption is that the trial court did not give the evidence any weight as against Andrew Dyatt.

3. The trial court found specifically that Andrew Dyatt had knowledge of the material contents of the two contracts relating to the sale of the land to the plaintiff before he purchased it from his brother, and also that he entered into a fraudulent agreement with him for the purpose of depriving the plaintiff of his rights under such contracts, "and took a conveyance to the land in question." The defendants assert that there was no evidence to support either of these findings.

The plaintiff testified that he reported to Andrew Dyatt his bid of $35 an acre, and the latter said: "We were willing for it to sell for less money, you have bid it in, now you can just keep it. . . . I don't want it, and you can just keep it as your bid." J. B. Dyatt testified that he first learned of the plaintiff's bid when he got word from Andrew. A part of his cross-examination was as follows:

"Q. Did you tell Andrew that Leinbach had demanded this property? A. We had a little talk about it, one way or another.

"Q. Did you tell him anything about these papers having been signed? A. I told him about the papers I had signed at the bank.

"Q. One was the Leinbach sales contract? A. I suppose so, and that they figured up the amount of $300,000, and he said that was wrong and don't settle on that kind of commission, it will not amount to one-third of that.

"Q. Did you tell him you signed this, agreeing to sell the land to Leinbach? A. I don't know; I supposed it was a sales contract I signed."

A Tribune attorney who had taken part in the negotiations resulting in the compromise wrote to Andrew Dyatt at Almena on May 17 reciting the settlement and the execution of the contracts for the sale of the land to the plaintiff, and saying that it seemed imperative that an action should be brought against the brothers and a receiver of the land asked for, adding that he would be in Goodland on the morning of the 23d. He testified that at the same time he sent a telegram to Andrew Dyatt, who denied receiving it. Andrew Dyatt testified that he thought he got the letter about the 21st or 22d. The deed from J. B. Dyatt to his brother was dated May 19. Andrew Dyatt testified that he bought the property for $40,000 over the

mortgage, which he assumed and renewed. That he met the attorney referred to on May 26, and at that time had not paid his brother in full.

It is obvious that Andrew Dyatt is not entitled to the full rights of an innocent purchaser, since he does not profess to have paid all of the purchase price at the time he admits he had full knowledge of the situation (*Green v. Green*, 41 Kan. 472, 21 Pac. 586), and indeed did not testify that he had paid any cash before learning of the plaintiff's claim. We regard the evidence already recited as sufficient to support the inference which the trial court drew, that Andrew Dyatt knew of the deal with the plaintiff when he took the deed, and that he took it in collusion with his brother for the purpose of defeating the plaintiff's right to the land.

The rights obtained by Andrew Dyatt through the deed from his brother being subordinate to those of the plaintiff, his wife could acquire no higher interest in the land by virtue of that relation. If the wife of J. B. Dyatt should survive him she would take no interest in his land sold on judicial sale or necessary for the payment of his debts. (Gen. Stat. 1915, § 3831.)

4. The defendants seek to invoke the rule that a simple contract creditor, having no lien on the property, cannot successfully attack as fradulent a conveyance made by his debtor. The present case is not within that rule. The plaintiff by, his contract of purchase acquired a right to the property which could not be defeated by a conveyance to one having knowledge of it. (39 Cyc. 1647, 1648.)

5. J. B. Dyatt filed a demurrer to the petition on the ground that several causes of action were improperly joined, and complaint is made of the order overruling it. The allegations of the making of the original contract, of the things done under it, and of the compromise of the disagreement about the amount due the plaintiff were all essential to the case for specific performance, because showing in what manner the 25 per cent of the purchase price was paid, and this cause of action affected all parties. But, as already shown, the commission agreed to was $27,200, and only $25,200 of this was turned on the contract of sale, leaving a balance of $2,000 for which the plaintiff asked and obtained judgment against J. B. Dyatt. The facts essential to specific performance could not be established without also establishing the existence of the personal demand for $2,000 against J. B. Dyatt. None of the other defendants, however, were directly affected by this part of the plaintiff's

claim, and ordinarily its inclusion in the petition would seem to amount to a misjoinder. But the rule that only those causes can be joined which affect all the parties does not apply in actions to enforce mortgages or other liens. (Gen. Stat. 1915, § 6979.) A substantial part of the relief sought by and granted to the plaintiff was the enforcement of a lien against the land in question; the defendants, other than J. B. Dyatt, were brought in wholly or in part because of their actual or supposed interest in the land; the only judgment (other than for costs) rendered against anyone except J. B. Dyatt was the decree for the sale of the property to pay the lien. In this situation the overruling of the demurrer was not error.

6. The plaintiff asks the modification of the trial court's decision so that the personal judgment for the $25,200 shall run against Andrew Dyatt as well as against J. B. Dyatt. It has been held that where the vendor, in conspiracy with a third person who assists him therein, disables himself to perform a contract for the conveyance of land, the purchaser, when denied specific performance on that account, may have judgment for damages against both of the persons by whose conduct it was prevented. (*Powell v. Young,* 45 Md. 494.) We do not think the present case falls within that rule, for while the trial court found that Andrew Dyatt entered into a fraudulent agreement with J. B. Dyatt for the purpose of depriving the plaintiff of his rights, the fair implication is that the method by which this purpose was sought to be carried out was by the conveyance of the land to Andrew Dyatt. That conveyance did not prevent the specific performance of the contract. So far as it was concerned, specific performance could have been adjudged and enforced, the decree cutting off the interests of both the Dyatts. What prevented an effective judgment for specific performance was the existence of the mortgage, without the release of which the Dyatts could not make a good title. This mortgage was not a new lien, but a mere renewal of an old one. J. B. Dyatt's agreement to convey the land was presumably entered into in the expectation that he would make some provision for its release as to this tract. Because of his failure to do so, a deed from him would not have passed a clear title, even if he had not executed the deed to his brother. It was not found that his omission to provide for the release of the mortgage was in any degree due to the conduct of Andrew Dyatt. In this situation we cannot say that it was error to deny a personal judgment against the latter.

The judgment is affirmed.