NOT DESIGNATED FOR PUBLICATION

No. 122,023

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

JOSEPH R. HACKNEY and JONI M. HACKNEY,
*Appellees*,

v.

ROBERT J. ALLEN and the ESTATE of LOIS J. ALLEN, and ROBERT N. ALLEN,
*Defendants*,

and

RONALD E. RETTELE and KIMBERLY K. RETTELE,
*Appellants*.

MEMORANDUM OPINION

Appeal from Brown District Court; JOHN L. WEINGART, judge. Opinion filed December 3, 2021. Affirmed.

*William C. O'Keefe*, of O'Keefe Law Office, of Seneca, for appellants.

*Matthew R. Bergmann*, of Frieden & Forbes, LLP, of Topeka, for appellees Joseph R. Hackney and Joni M. Hackney.

Before GARDNER, P.J., GREEN and BUSER, JJ.

BUSER, J.:  This appeal concerns a contractual dispute over the sale of real estate in Brown County. After a bench trial, the district court granted specific performance and awarded the property to Joseph and Joni Hackney (Hackneys) who contracted to purchase the real estate from Lois and Robert J. Allen (Allens). The district court ruled the Allens breached the contract by failing to consummate the sale of the property. On a related

1

matter, after the Hackney-Allen real estate contract was signed, the Allens sold the property and gave a quitclaim deed for the real estate to Ronald and Kimberly Rettele (Retteles). The district court found that the order of specific performance of the Hackney-Allen contract vitiated the quitclaim deed held by the Retteles. But the district court granted the Retteles judgment against the Allens for the purchase price of the land, other damages, and attorney fees.

On appeal, the Retteles contend the district court abused its discretion by granting specific performance and awarding the real estate to the Hackneys and invalidating their quitclaim deed to the property. Finding no error in the district court's judgment, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On March 25, 2015, the Hackneys executed a written contract to purchase real estate owned by the Allens and located in Fairview, Kansas. The property was located across the street from the Hackneys' used car business and included a storage shed that Joseph intended to use to expand his business and protect the cars from hail. The Hackneys agreed to pay $17,500 for the real estate, and they placed $1,000 in escrow as an earnest money deposit on the day the contract was signed. The remaining purchase price was to be paid at closing, which was scheduled to occur on or before April 20, 2015.

The Allens' son, Robert N. Allen (Robbie), signed the contract on behalf of his parents by the authority of two durable powers of attorney, executed in Nebraska in 2006, after the Allens were seriously injured in a car accident. Notably, the powers of attorney did not include a notary stamp since it was not required under Nebraska law at that time. According to Dennis White, who was the title or closing officer for the real estate purchase and prepared the real estate contract, the transaction was either going to be

executed by Robbie on behalf of his parents on the authority of the powers of attorney or by the Allens themselves.

On April 4, 2015—16 days before the scheduled closing—the Retteles approached Lois regarding purchasing the real estate that was under contract for sale to the Hackneys. Lois informed the Retteles that the property was for sale but there was already a contract in place to purchase it. Lois never identified the Hackneys as the purchasers of the real estate. According to Kimberly, Lois told them that "there was a contract on [the property, but] it had not been sold" and that they would have to get in touch with Robbie if they wanted to purchase it. Lois stated that the Allens would accept $20,000 for the property. Lois also advised that Robbie was handling the Allens' affairs, which made sense since the Allens were elderly and struggling with health problems.

The Retteles reached out to Robbie, who lived in Texas. Kimberly recalled that she "[t]old him what I wanted. Told him I'd [spoken] with his mom. And that [I] just wanted to let him know that there was a contract. I knew that, but if something happened to that contract, that Ron and I would be interested in purchasing the property." Robbie explained to the Retteles "that there was a contract, [that he] had not heard from them in several weeks and didn't really know what was going on with it, but he was worried that his Power of Attorney wasn't any good because it was not stamped . . . ." According to Robbie, a bank in Texas told him that the Nebraska powers of attorney did not meet financial standards, and the Brown County Register of Deeds advised that the powers of attorney could not be filed in Kansas because of the missing notary stamps. Based on his doubts about the validity of the powers of attorney, Robbie told the Retteles that the original contract was going to fall through.

The Retteles never confirmed that the prior contract was in fact canceled. Instead, they quickly negotiated to purchase the real estate. Although Lois had told the Retteles they would accept $20,000 for the property, Robbie negotiated the purchase price up to

3

$25,000. After agreeing to the terms, Robbie prepared and delivered a real estate purchase contract to the Retteles.

On April 13, 2015—one week before the specified closing date in the Hackney-Allen contract—the Retteles delivered a personal check for $25,000 to Lois. A few days later, the Allens moved to Texas. Robbie then sent the Retteles a quitclaim deed for the property executed by the Allens.

On April 20, 2015—the agreed-upon closing date for the Allen-Hackney real estate purchase—the Hackneys tendered a cashier's check for the remaining balance of the purchase price in escrow with White's title company. Robbie, however, did not attend the closing. Robbie informed White by email that he had no intention of closing on the contract with the Hackneys because of the issue regarding the validity of his powers of attorney.

Eight days later, on April 28, 2015, the Retteles registered the quitclaim deed. A few days after the Retteles took possession of the property, Joseph confronted the Retteles, telling them that he and his wife had bought the property and they would be hearing from his lawyer.

Joseph kept his promise. The Hackneys filed suit against the Allens and Robbie, and the Retteles. The lawsuit included claims of breach of contract, fraud by promise of future events, and promissory estoppel against the Allens; negligent misrepresentation against Robbie; and tortious interference with a contractual relationship against the Retteles. In response, the Retteles filed a cross-claim as codefendants and third-party plaintiffs, seeking indemnification from the Allens.

Prior to trial, and before responding to the motions for summary judgment filed by the Hackneys and the Retteles, the Allens' attorney withdrew from the case. From that

4

point on, the Allens defaulted by failing to defend against the lawsuit, including not attending the trial.

Joseph and the Retelles testified at trial. The Hackneys also presented Kyle Mead, a title examining attorney, as an expert on real estate transactions, and White, the closing officer, regarding the contract with the Allens. Mead testified that Robbie's powers of attorney were validly executed under Nebraska law and that they could have been filed as an exhibit with the Register of Deeds. That said, Mead distinguished between the validity of the powers of attorney and the recordability of them—that is, he explained that the powers of attorney were valid even though they were not accepted by the Brown County Register of Deeds. And Mead further clarified that while the Register of Deeds was "within her rights and responsibilities to refuse to record [the durable powers of attorney because of the missing stamps]," the documents could have been made right. In Mead's expert legal opinion, it was not necessary for the court to find that the Retteles intentionally bought the property out from under the Hackneys in order to nullify the Retteles' quitclaim deed and grant specific performance of the Hackney-Allen contract.

After submission of the trial evidence, the district court filed a nine-page journal entry of judgment which detailed the court's findings of fact and conclusions of law. The district court found the Allens were in default on all the allegations made against them—specifically, that they had breached the contract with the Hackneys. The court concluded that Robbie acted with both actual and apparent authority to negotiate the Hackney-Allen contract on behalf of his parents. Having entered summary judgment for the Hackneys, and finding no adequate remedy existed at law, the district court granted specific performance of the contract, plus interest, attorney fees, and costs. In so ruling, the district court invalidated the quitclaim deed the Allens had given to the Retteles, noting the property was "still owned by the Allens subject to the Court's order of complete, specific performance."

Regarding the Retteles, the district court found that although their actions were "ill-advised and ill-conceived," there was insufficient evidence to establish the Hackneys' claim of tortious interference. However, the district court granted the Retteles summary judgment against the Allens for the purchase price of the property, $25,000, and other damages, costs, and attorney fees.

The Retteles filed a motion for relief from judgment, in which they argued the Hackney-Allen contract "was never finished," "was cancelled by the [Allens]," and that specific performance was improper because the recorded quitclaim deed superseded any interest the Hackneys had in the property. The motion was denied.

The Retteles appeal.

ANALYSIS

On appeal, the Retteles contend the district court failed to follow applicable law and abused its discretion in ordering specific performance of the Hackney-Allen contract by voiding their quitclaim deed to the real estate. The Retteles maintain that because the district court found they had not committed tortious interference, the court's order mandating specific performance was in error. Moreover, the Retteles assert the court "doesn't understand how equity works" and that it "use[d] equity to vary the law of a bona fide purchaser who acted in good faith."

The Hackneys counter that Robbie erroneously determined that the powers of attorney executed in Nebraska were invalid. The Hackneys assert that, as determined by the district court, Robbie had both actual and apparent authority to bind the Allens to the real estate contract. Finally, the Hackneys support the district court's finding of specific performance by highlighting their intended special use for the property given its close

proximity to the Hackneys' Holthaus Autohaus business, such that no adequate monetary remedy existed.

*Validity of the Hackney-Allen Contract*

To analyze whether the district court abused its discretion by ordering specific performance, we will first determine whether there was a valid contract between the Hackneys and Allens, and whether the Allens breached the contract by refusing to close the deal, and instead negotiate a separate, more lucrative, contract with the Retteles.

An appellate court exercises unlimited review over the interpretation and legal effect of written instruments such as the Hackney-Allen real estate contract, and it is not bound by the district court's rulings. See *Born v. Born*, 304 Kan. 542, 554, 374 P.3d 624 (2016). Formation of a contract requires a meeting of the minds on all essential elements and depends on the intent of the parties; whether a contract was formed is a question of fact. *U.S.D. No. 446 v. Sandoval*, 295 Kan. 278, 282, 286 P.3d 542 (2012). Similarly, the question of whether a contract was breached is also a question of fact. *Peterson v. Ferrell*, 302 Kan. 99, 104, 349 P.3d 1269 (2015). We will not disturb a district court's factual findings so long as they are supported by substantial competent evidence—that is, appellate courts will not reweigh the evidence but will accept the district court's findings if there is evidence in the record that reasonably supports its ultimate finding. 302 Kan. at 104.

The district court ruled the Allens "were bound by their agent to perform in accordance with the real estate contract when [Robbie] Allen executed the real estate contract on their behalf." Moreover, according to the district court, "the terms and conditions of the real estate contract . . . should have been completed in full with the closing of the real estate contract resulting in the transfer of title to the Hackneys."

Here, the Hackney-Allen real estate contract was in writing and covered the essential terms with sufficient certainty for the district court to understand and enforce the mutual obligations of the parties. Upon our review, the district court's factual findings are directly supported by the terms of the contract, which specifically described the property being sold and the type of title to be transferred. Additionally, the contract clearly stated the purchase price and method of payment, scheduled the closing date, and identified the closing agent. Finally, the document was signed by both the Hackneys and Robbie, acting on behalf of his parents. In summary, we find no error in the district court's finding that the Hackney-Allen contract contained all the essential terms and elements, and clearly expressed the intent of the parties. The contract was valid and binding.

*Breach of the Hackney-Allen Contract*

Next, we consider whether the district court erred in concluding that the real estate contract was breached. According to the district court, "because the Allens failed to close on the real estate contract, the Allens have breached the terms and conditions of the real estate contract."

In Kansas, the elements of a breach of contract claim are:  (1) the existence of a contract between the parties; (2) sufficient consideration to support the contract; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) the defendant's breach of the contract; and (5) damages to the plaintiff caused by the breach. *Stechschulte v. Jennings*, 297 Kan. 2, 23, 298 P.3d 1083 (2013).

The contract provided that the Allens "agree[d] to sell and convey [the property to the Hackneys] by a good and sufficient joint tenancy warranty deed" and contracted to finish the transaction by delivering a warranty deed "on or before April 20, 2015." The Hackneys paid the initial $1,000 earnest deposit and placed the remaining $16,500 of the

purchase price into an escrow account with the closing agent. Robbie, having doubts about his powers of attorney, started negotiating with the Retteles for a higher sales price. Ultimately, Robbie reneged on the contract, informing White he would not be completing the transaction. One week before the closing date specified in the Hackney-Allen contract, the Allens received a $25,000 check from the Retteles, and subsequently sent the Retteles a quitclaim deed to the property.

The district court's finding that the contract was breached was supported by substantial competent evidence. The Hackneys fully complied with the terms of the contract by providing the purchase price amount for the real estate to the closing agent. The Allens breached the plain terms of the contract by not closing on the real estate transaction and failing to deliver a warranty deed for the property on the agreed-upon date of performance or thereafter. Based on this evidence, the contract was breached by the Allens.

*Specific Performance*

Because the Allens breached the Hackney-Allen real estate contract, the question presented is whether the district court abused its discretion in granting the Hackneys specific performance by ordering the sale of the property to the Hackneys and voiding the Retteles' quitclaim deed.

On appeal, the Retteles raise one issue: "Can a court fail to follow the law and exercise equity at will at any time?" Perhaps a more precise presentation of the Retteles' claim of error is found in the conclusion of their brief: "Can a court at will use equity to vary the law of a bona fide purchaser who acted in good faith with a substantial payment?" In short, the gravamen of the Retteles' appeal is that the district court abused its discretion by invalidating the quitclaim deed and ordering the delivery of a warranty deed to the Hackneys as provided by their real estate contract.

9

In response, the Hackneys assert that the district court's order of specific performance was proper because

> "the Property is situated directly adjacent to property which Plaintiff currently owns and operates their business (Holthaus Autohaus). Moreover, the Property contains certain improvements, including buildings and structures which allow for protection of automobiles and/or vehicles. Plaintiff, in good faith entered into the Contract with the Allens on March 25, 2015, so that the Property could be used for specific purposes related to these business operations."

The district court ruled the Hackneys did not prove the Retteles had engaged in tortious interference involving the Hackney-Allen contract. Still, the district court found "the Retteles knew of a contract but did not know the specifics of the other [Hackney-Allen] contract other than there was a contract in existence," and Robbie advised them that although there was an existing contract it was "not valid." Based on this information, the district court found, "The Retteles took action which was ill-advised and ill conceived."

All things considered, the district court ruled, "[T]he Hackneys have no adequate remedy at law to enforce the provisions of the contract other than specific performance of the contract." As a result, the district court "ordered that the Allens should close on the contract and that the Hackneys be allowed to purchase the subject property." Moreover, the district court found the Hackneys were entitled to interest on the $17,826.26 being held in escrow from the date of tendering it until the date of closing.

The district court granted the Retteles summary judgment against the Allens and Robbie Allen, who were in default. The district court ordered the Allens to pay a money judgment of $25,000 to the Retteles, payment of the cost of improvements minus rental payments received by the Retteles, taxes, and attorney fees of $8,175.14. The district court stated that its order was intended "to make the Retteles whole for this transaction,

10

but not at the expense of the Hackneys." Towards that end, the district court ordered that "[t]he money in the closing from the Hackneys to the Allens shall be subject to execution by the Retteles as a part of their judgment if the Allens don't voluntarily comply with this decree and satisfy the judgment."

To begin the analysis, we briefly summarize the relevant Kansas law regarding specific performance. "Whether equity will decree the specific performance of a contract rests in the sound judicial discretion of the court and it always depends upon the facts and circumstances of the particular case." *Hochard v. Deiter*, 219 Kan. 738, 740, 549 P.2d 970 (1976). A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *Biglow v. Eidenberg*, 308 Kan. 873, 893, 424 P.3d 515 (2018).

A party seeking specific performance—in this case the Hackneys—must establish "the existence of a valid binding contract, which is definite and certain in its terms and contains the requisite of mutuality of obligation, and is one which is free from unfairness, fraud, or overreaching, and enforceable without injustice upon the party against whom enforcement is sought . . . ." *Hochard*, 219 Kan. 738, Syl. ¶ 2. In this regard, "[t]he requirement of certainty in the terms of the contract extends to the parties, subject matter, purposes, consideration, place and time of performance, terms of payment and duration of the contract." *Pitts v. Marsh*, 222 Kan. 586, 587, 567 P.2d 843 (1977). That said, reasonable certainty in these terms is all that is required:  "[T]he contract need not provide for every collateral matter or every possible contingency which might arise with respect to the transaction." 222 Kan. at 587.

Once a contract, and the breach thereof, is established, a court may order specific performance if "the remedy at law for the breach of such contract is inadequate and the enforcement of specific performance will not be inequitable, oppressive, or unconscionable, or result in undue hardship . . . ." *Hochard*, 219 Kan. 738, Syl. ¶ 2.

11

Regarding the use of specific performance as an equitable remedy, our Supreme Court has stated: "Ordinarily there is no equity in releasing a party from a fair and reasonable contract into which he freely entered unless the circumstances of the case require it." *Anderson v. Overland Park Credit Union*, 231 Kan. 97, Syl. ¶ 3, 643 P.2d 120 (1982).

As noted above, an order for specific performance is highly dependent on the facts and circumstances of each individual case. See *Wichita Clinic, P.A. v. Louis*, 39 Kan. App. 2d 848, 871, 185 P.3d 946 (2008). Where a contract is in writing and covers all the essential requirements with sufficient definitiveness for the court to understand and enforce the mutual obligations of the parties and monetary damages are an insufficient remedy, specific performance is a viable remedy. See *Pitts*, 222 Kan. at 587.

Here, the terms of the Hackney-Allen contract were sufficiently clear for the district court to enforce the obligations of the parties—specifically, the Allens' obligation to deliver a warranty deed to the Hackneys at closing in exchange for the $17,500 purchase price that had been placed in escrow. Robbie, acting on behalf of the Allens under actual or apparent authority, freely and voluntarily entered the contract and its terms were reasonable and fair. Yet, the Allens decided not to honor their contractual obligations. Because of the Hackneys' intended special use for the property and given its close proximity to the Hackneys' Holthaus Autohaus business, no adequate monetary remedy existed at law.

To support their argument against the district court's order for specific performance, the Retteles point to their reliance on Robbie's representation that the Hackney-Allen contract was canceled (or at least was going to be canceled), the fact that they gained ownership of the property, and they were found not liable for tortious interference. The Retteles do not address the special business purpose the Hackneys envisioned for the real estate.

12

The Retteles' argument is not persuasive. The fact that the Allens conveyed the property to them after breaching their contract with the Hackneys does not bar the remedy of specific performance under the circumstances where the Retteles were on notice of the existence of the preexisting contract when they decided to proceed with purchasing the property.

Long standing Kansas caselaw provides that the right to specific performance of a real estate contract is not defeated by a seller's later conveyance of the land to a third party. See *Tinkler v. Devine*, 159 Kan. 308, Syl. ¶ 2, 154 P.2d 119 (1944) (affirming district court's granting of specific performance, noting "the lessee was entitled to specific performance of the contract even though the land had been conveyed to the third party"); *Leinbach v. Dyatt*, 112 Kan. 782, Syl. ¶ 4, 212 P. 894 (1923) (holding a "buyer's right to the specific performance of a written contract for the sale of land cannot be defeated by the seller conveying to one who has knowledge of the prior agreement"); *Wilson v. Emig*, 44 Kan. 125, 129, 24 P. 80 (1890) (noting "where a specific performance will be decreed between original parties, it will lie as to parties claiming under them with knowledge"); *Miller v. Alexander*, 13 Kan. App. 2d 543, 551, 775 P.2d 198 (1989) (holding "an option to purchase may be enforced against a subsequent buyer with notice"). Of note, nowhere in this caselaw is a requirement found that specific performance vitiating the third party's possession of property is only appropriate when the third party engages in tortious interference with the real estate transaction.

Applying this precedent, the fact that the Allens conveyed the property to the Retteles by providing a quitclaim deed did not insulate the Retteles from the district court's order of specific performance if they had knowledge of the existence of the outstanding contract on the property. During the trial, the Retteles conceded that they did have knowledge that a contract for the property was already in existence. While they did not know the Hackneys were the individuals who had contracted to buy the property, they were informed of the outstanding contract and were told by Robbie that it was going to

13

fall through—not that the contract had been canceled. The Retteles simply relied on this vague and speculative representation by Robbie, and never investigated the matter to review the terms of the Hackney-Allen contract, and then speak with the Hackneys as purchasers, or White as closing agent, to ascertain whether the contract was, in fact, canceled before purchasing the property.

Moreover, despite the Retteles' "ill-advised and ill-conceived" method of acquiring the property, the district court still granted them a monetary judgment against the Allens "to make the Retteles whole." In this way, by ordering specific performance to the Hackneys and indemnifying the Retteles, the district court did not abuse its discretion but crafted a remedy that provided both the Hackneys and Retteles relief from this unfortunate real estate transaction.

Applying our standard of review for abuse of judicial discretion, we hold the district court did not commit an error of fact or law nor can it be said that no reasonable person would agree with its ruling. Given the circumstances of this case, the district court did not abuse its discretion in ordering specific performance of the Hackney-Allen contract.

Affirmed.